The next case is Robert Velez v. Security, 06-3305. Robert Velez v. Security, 06-3305. Mr. Jarman, when you are ready. Thank you. May it please the court. My name is Mark Jarman. I am a clerk in Mexico. This case relates to a decision of the American System of Protection Board in which it improperly overturned the decision of an A.J. That A.J.'s decision was largely grounded on the demeanor-based credibility findings of particularly the testimony of the accountant Robert Velez. Now, I'm aware that the board's decision pays some lip service to the concept of deference but, in fact, the board's decision disregards the A.J.'s credibility findings virtually in their entirety. But, Mr. Jarman, didn't the board in this case articulate sound reasons based on the record for its contrary evaluation of the testimony and isn't that the test in heavy that applies? Certainly the test in heavy does say that the board is able to articulate sound reasons but it has to be based upon giving some degree of deference to the credibility determinations that are made. There are occasions, certainly. But that's how deference is accorded to the A.J.'s determination. It's accorded by recognizing the determination and supporting that determination unless there is articulated sound reasons based on the record for contrary evaluation and that's exactly what seems to have occurred here. Respectfully, I would disagree with the court in the analysis of the board's opinion. What the board did was totally disregard the testimony of Mr. Bellis. So we just don't believe it happened that way. But there was a reason that they disregarded his testimony. None of it was articulated in their evidence. Well, the fact that there was evidence that showed that no FBI fingerprint check had been conducted which would indicate that somebody was lying when they said to him that a test had been conducted. But that's not the test. The test is what Agent Bellis believed. What Agent Bellis believed is that the checks had been run. That's what he had been told. That was his testimony. But that testimony comes in the face of evidence that shows that a test had never been done which indicates that either he's mistaken in his testimony or that somebody else is lying and that was a factor that was taken into account by the board, was it not? Even if somebody else was lying, for example, the radio room misinformed Agent Cantu that checks had been run or Agent Cantu got confused as to which alien that they were talking about. She reports to Bellis and says the checks came back in and the agency's own witness says Agent Bellis is allowed to rely upon that. Well, even if we accept that it's true, there's other evidence here that the board considered. We talked a moment ago about the FBI fingerprint checks, but there were other evidence considered as well. The only other evidence that is considered by the board is the unsworn hearsay testimony of the convicted murder of a rapist. And they found that to be more credible than Agent Cantu and Agent Bellis' testimony. And that's just frankly shocking to me. There was no chance that the appellant had any chance to evaluate that testimony. There was no court interview that was ever submitted. There was no chance to cross-examine Mr. Esparza and find out what he really did. In fact, even the testimony from the agent who conducted the interview said something to the effect of he didn't tell me that he had been transported up to Denver. We don't even know if the question was asked of Mr. Esparza, because we have no report of interview and there's no evidence in the record about it. Now, was Mr. Esparza, was there a reason for him to lie about that? I know his character is not the best in the world, but was there a reason for him to lie under the interview? Did he even know why the investigation was taking place? Did he know that it was taking place? We don't know, because we don't have a report of interview. I would suspect that there's going to be a general antipathy towards all law enforcement that is subjective. But we have no evidence in the record, one way or another, as to what his feeling was. And the board created that on a whole cloth. Well, the board did not create all of the other evidence on a whole cloth, though, because it certainly had substantial evidence to take a look at what the objections were in the process of weighing the evidence. They did weigh all of the evidence, pro and con. I don't think so, Your Honor, with respect. I don't think that they weighed the evidence for Mr. Velas at all. They just chose to disbelieve what was described by the A.J. as being straightforward and candid testimony. They didn't look at what he said. What he said was, I was told by Cantoo in Deming that this is what happened. Now, what the board does is selectively quote a portion of an affidavit which was submitted by Mr. Velas. And what that affidavit says is that the conversations took place over the phone. But the next paragraph of the affidavit says, I believe that I talked to her about this subject in Deming. That's consistent also with his deposition, it's consistent with his testimony in court, which the A.J. had a right to evaluate and look at and use his powers of observation, and those should be accorded considerable deference. This is a heavy type of case in which the board has strung together circumstantial evidence and then come up with a decision that is absolutely contrary to what the A.J. found in his, after observing all the witnesses and their credibility. But if the witness says that A.J. took place and this is at the hearing, the record is pretty clear that A.J. did not take place. Now, wait, wait, wait. On a hypothetical basis, does the board have the ability to weigh that additional evidence, other evidence that's in the record to say that A.J. did not take place? Sure. Is that what happened here? No, sir. What's the difference? What Vela said is Cantu told me A.J. took place, and it doesn't matter whether A.J. took place or not because the issue is, did Cantu tell him A.J. took place? And their witness said it's okay for the supervisor to rely upon the report that A.J. took place, even if A.J. did not take place. That's the difference here. Well, if A.J. didn't take place, then Agent Cantu would have to have lied about it. Or been mistaken, yes. Or given not wrong information, yes, that's correct. Isn't that a factor that, in this case, the board was appropriately took into account? No. Why not? All of this evidence is to be weighed and balanced in determining the truth of the matter before the board. The board came to the conclusion, based upon a number of factors, that Agent Velez's testimony was not credible. They don't get to make that decision on credibility. What we have is a situation in which the agency says it's just fine for the supervisor to rely on the subordinates, particularly an untrained supervisor on his third day of a temporary assignment. It's just fine to rely on your subordinates. And even if the subordinates make a mistake, as Agent Cantu may well have done, it's not the temporary supervisor's fault. He's entitled to rely on her report, even if it's erroneous. What the agency was able to prove is that Cantu did not make phone calls from the location in southern New Mexico called Columbus, which is right on the border. But it didn't even bother to investigate what happened in the radio room. It didn't even bother to interview the witnesses there. It didn't submit any record evidence. The telephone tolls, which it had from the Deming substation, wouldn't produce any discovery. So we have no way of knowing if those would have been expulgatory to Mr. Velez. And I cited in my briefs the presumption which you can make against the government as a result thereof. We have a supervisor who relied upon a subordinate. And if the subordinate got it wrong, it's not fair to blame the supervisor. Their own witness said that it is all right for the supervisor to rely on the subordinate. Mr. Chalmers, you're into your rebuttal time, which you can continue to use or save as you wish. Why don't I reserve it unless the Court has immediate questions of me? Fine. Ms. Kidmiller. May it please the Court. The Board had sound reasons in this case for overturning the administrative judge's credibility determination. They did more than merely pay lip service to the demeanor-based deference requirement. And because they did set forth sound reasons, namely that there was no record evidence to corroborate or support Agent Velez's expulgatory explanation, and that that explanation did not reflect the record as a whole, this Court should affirm the decision of the Board. But they did analyze it as credibility determination, didn't they? Yes. They really based it on a credibility determination. And then they said, well, credibility determination is fine, but the weight of the evidence is so much against it, we're going to weigh it in favor of the agency. The Board specifically overturned the administrative judge's credibility finding with respect to Mr. Velez. Based upon the evidence that was overwhelming, supposedly, according to that? Primarily, yes, because it did not reflect the record as a whole. Agent Velez's explanation was also inconsistent with some pieces of evidence. And as the Board described, the administrative judge's credibility findings were, in some respects, incomplete. So for all of those reasons, all of those reasons played a part in the Board overturning the AJA's credibility determination. Agent Velez's expulgatory explanation has always been very specific, that Agent Contu transported Mr. Esparza to Deming, and while in Deming, had a face-to-face conversation with Agent Velez, and at that point said to Agent Velez that the NCIC, or FBI background check, had been run. And the Board specifically discussed each of the pieces of that expulgatory explanation. Notably, almost all of the cites provided by Mr. Velez in both his initial and reply brief, cites for what Agent Contu said and what Agent Contu allegedly did, are citations to Agent Velez's statements. Agent Velez, again, has been fairly consistent in his story all along. But the weight of the record evidence demonstrates that Agent Contu did not tell Agent Velez that the NCIC check had been done. The administrative judge relied primarily on Agent Contu's usual practices to say that she told Agent Velez the check had been done. But the record makes clear here that the usual practices were not followed. There was no check actually done. In addition, one of Agent Contu's usual practices would have been to report in the narrative section of the I-213 form the results of the NCIC check. That's not present here. And for that reason among others, the Board determined specifically that Agent Contu did not tell Agent Velez the check had been done. Was Agent Contu alone? Were there any other agents around her at the time that Mr. Esparza was arrested and transported up to Denver? Was she the only agent around? There were other agents with her at the time of the arrest and in the Columbus Processing Center when the fingerprinting and contacts with Oregon were made. Were there depositions taken? Yes, Your Honor. Agent Velez had his deposition taken. Agent Contu had her deposition taken. But what about the other agents? Agent Mulliker gave a statement, I believe September of 2002. It was not a deposition, but she did provide a statement. And in addition, the Office of the Inspector General team of investigators spoke to radio room employees and other individuals who had some involvement with the investigation. But I don't recall reading anything in the record that would corroborate or question the statement about traveling the 35 miles with Mr. Esparza up to Deming. And it would seem to me if other people were around, they could easily say yes, yes, they did leave or yes, they did show up here or something like that. Yes, Your Honor, that is what one would expect. And the board pointed out several pieces of evidence that demonstrate that in fact it's inherently improbable that Mr. Esparza was transported to Deming. And the board specifically found that Mr. Esparza was not transported to Deming. Well, I realize that. But it seems to me the record is a little sparse, and I would have expected more evidence on what should have been apparent if there were other people around. Is there any reason that evidence is not there in the record? Your Honor, I'd submit that there is substantial evidence, and I'll briefly review what that evidence is. I mean, I'm aware of the phone calls and that evidence. But were there any affidavits or statements from witnesses who observed Agent Cantu and Mr. Esparza leave to travel up to Deming? No, Your Honor, because they did not leave to travel up to Deming. That did not happen. Instead, we have the I-213 form. Well, maybe I should rephrase my question. Are there any other witnesses to establish that they didn't leave? We have statements from Agent Cantu and also testimony from Agent Cantu and Chief Barker about the reasons why someone would be transported. I'm aware of that. But you would expect that this would be a simple thing, an affidavit from, if there were three other people that were there, affidavits from those three people that would simply corroborate they never left. No one else has said that they did leave. There's no evidence that they did leave. It's an effect of proving a negative, attempting to prove a negative. When this investigation first began, Agent Velez was not at that point saying that Agent Cantu had transported Agent or rather Mr. Esparza up to Deming. That explanation came a little bit further on in the investigation. Now admittedly, yes, that could have been an affidavit from people saying we never saw Esparza leave Columbus and go to Deming. Certainly could have been additional evidence in support of the agency's position. But the evidence that is in the record gives no indication at all that Mr. Esparza was transported, explaining that there would have been no reason to have transported him. And then we have Mr. Esparza's interview with one of the investigators in which he stated that he was in Columbus during the entire evening and then voluntarily released back to Mexico. And finally, Your Honor's question dovetails into the issue of whether Cantu told Agent Velez in person, whether she actually made it to Deming with Mr. Esparza. And we do have Agent Mulliker's statement that Agent Cantu contacted Agent Velez. And Agent Cantu said on numerous occasions that she contacted Agent Velez, which is a bit of a strange way to describe an in-person conversation if that's what really took place. In essence, when the Board articulates sound reasons for overturning a credibility determination as it did here, it acts within its authority. This last point, I would like to clarify that the administrative judge and the Board here applied the standard of care that Agent Velez could rely on a statement by his subordinate. But if you read pages 140 and 141 of the Joint Appendix, Agent Barker did not say that Agent Velez could rely solely on the statement of his subordinate. Agent Barker, or Chief Barker, expressed the standard as relying on the subordinate and reviewing the 213 form. However, we do recognize that the Board simply assumed that Agent Velez could rely on Agent Cantu, but nonetheless found that even under Velez's own standards, he failed to comply with his duties in the way that he should. For these reasons and those in our brief, we ask that the Court affirm the ruling of the Board. Thank you, Ms. Kidmiller. Mr. Chami has some rebuttal time. Judge Flynn, I'll answer your question as to what the record contained. There was no interview of any radio room employees. There was no interview of any other agent other than Agent Barker, who gave a statement which essentially related to her own activities, but nothing related to Mr. Esparza. Did you make any effort to obtain additional evidence on this point? Yes. The agency had, in fact, the telephone tolls indemnified and would not produce them. But in terms of getting statements from witnesses who might have observed whether there was indeed a face-to-face meeting, whether there was this trip 35 miles or not, if there were other people around, wouldn't it have been a relatively easy matter to get witness statements to verify what happened one way or the other? It could have been done. It was not done. Were you prevented from obtaining that evidence in any way? The agency asserted I – first, it made none of its records available to us. I understand that. Were you talking about witness statements, interviews with witnesses? I was not precluded from doing so, no. Though I expressed to the court, I came in to the matter 20 months after things had occurred. And the agency had been sitting on this for 18 months and, indeed, had desk-to-desk for that period of time. So I will tell you that the agency did a woefully inadequate job of investigating. There were a lot of things that could have been done. We don't even have a sworn statement or affidavit from Esparza as to what happened. We have hearsay testimony that was, at best, very incomplete and sketchy and not worthy of any reliance upon whatsoever. I need to correct Ms. Kidd-Miller. When she says there was no corroboration, Mr. Vela's contention that Cantu told him of the results of the record check. Indeed, Cantu's testimony confirms that she told him that. So you have just a couple things that are really at issue. And A.J. finds the credibility of Vela to be impeccable. This is a straightforward testimony. She told me this is what happened. Cantu says, I told him that's what happened. Now, even if it didn't happen, it's not important. Because what is important is what he was told and what he reasonably believed. I would suggest to you that the standard here ought to be one that is somewhat relaxed given his status as a temporary supervisor. I should take one moment to take issue with one of the contentions of the board. There was no reason for Cantu to transport as far as up to Deming. Recall that this happened late in the evening on a Friday night or Saturday night. If Cantu does not have records checked, she transports him up to Deming, where he's transported to El Paso if he's deportable, or transported back to Columbus if he's going to be voluntarily released. The importance of that is she gets to go home 45 minutes earlier if he's already up in Deming and somebody else transports him back into Columbus. Does the court have any more questions for me on this matter? Apparently not. Thank you, Mr. Chalmey. Case has been taken under advisement.